**PARAMOUNT HEALTH SYSTEMS, INC., Plaintiff,**

v.

**Robert W. WRIGHT, Director, Illinois Department of Public Aid, and Donna Shalala, Secretary, United States Department of Health and Human Services, Defendants.**

No. 95 C 1620.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 1, 1995.

Scott Howard Reynolds, Judith Schwartz Sherwin, Mark J. Bereyso, Levenfeld, Eisenberg, Janger, Glassberg, Samotny & Halper, Chicago, IL, for Paramount Health Systems, Inc.

James C. O'Connell, James C. Stevens, Jr., Mark Allen Lichtenfeld, Illinois Attorney General's Office, Chicago, IL, Jack Donatelli, United States Attorney's Office, Chicago, IL, for Robert W. Wright.

Jack Donatelli, United States Attorney's Office, Chicago, IL, Carol Federighi, Sheila M. Lieber, United States Department of Justice, Civil Division, Washington, DC, for Donna E. Shalala.

## MEMORANDUM ORDER AND OPINION

GETTLEMAN, District Judge.

Plaintiff, Paramount Health Systems, Inc., brought this suit against defendants Robert W. Wright ("Wright"), Director of Illinois' Department of Public Aid ("IDPA"), and Donna Shalala, Secretary of the United States Department of Health and Human Services (the "Secretary"), challenging the legality of particular aspects of Illinois' medical assistance program established pursuant to Title XIX of the Social Security Act, 42

U.S.C. §§ 1396 *et seq.* (the "Medicaid Act"). Plaintiff alleges that the Illinois medical assistance program, approved by the Secretary and administered by defendant Wright, violates Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare Act") and the Medicaid Act. Defendants filed motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), asserting that plaintiff lacks standing to bring this suit. For the reasons set forth below, defendants motions are denied.

## INTRODUCTION

Before discussing the merits of defendants' motions, it is necessary to provide a brief overview of the Medicare and Medicaid Acts. The Medicare Act is a federal program enacted to provide financing for medical procedures for people over the age of 65 and certain disabled individuals. 42 U.S.C. §§ 426(a), 1395c. Medicare is comprised of two parts, Part A and Part B. Part A, 42 U.S.C. §§ 1395c–1395i–4, provides reimbursement for inpatient hospital care and related post-hospital, home health care. Enrollment in Part A is essentially automatic.

Medicare Part B, 42 U.S.C. §§ 1395j–1395w–4, is a supplemental voluntary insurance program under which individuals may purchase supplemental insurance for hospital out-patient services, physician services, and other medical services not covered by Part A. 42 U.S.C. § 1395k. Part B coverage includes cost sharing provisions. Enrollees must pay an annual deductible and monthly premium. 42 U.S.C. §§ 1395*l*(b), 1395r. After an enrollee exhausts his deductible, the federal government will pay 80% of the "reasonable charge" for the services as determined by the Secretary. 42 U.S.C. §§ 1395*l*(a), 1395w–4. The service provider can then charge the beneficiary for the remaining 20% of the reasonable charge. 42 U.S.C. § 1395. This 20% charge is often referred to as "co-payment" or "coinsurance."

The Medicaid Act establishes a joint federal/state cost sharing program to provide medical assistance to individuals with insufficient income. A state's participation in Medicaid is voluntary. If a state submits a Medicaid plan to the Secretary and obtains approval, the state becomes eligible to receive federal funds. 42 U.S.C. §§ 1369a–c. Under Medicaid, each state establishes the fee that the state will pay a service provider for each item or service covered by the state's Medicaid plan. It is uncontested that in instances where Medicare and Medicaid cover the same equipment or services, the state Medicaid fee amount invariably is less than the reasonable charge for services that the federal government sets for Medicare reimbursement. *New York City Health and Hospitals Corporation v. Perales* 954 F.2d 854, 857 (2nd Cir.), *cert. denied,* 506 U.S. 972, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992). In fact, the state Medicaid fee is generally even less than 80% of the reasonable charge figure that the federal government pays under the Medicare Part B insurance plan. *Id.* As a result, the state Medicaid copayment would be zero.

The Medicaid and Medicare Acts intersect and provide coverage for the disabled, people over 65 (Medicare eligible) and that segment of the population who are also poor (Medicaid eligible). People who are eligible for both Medicare and Medicaid are known as "dual eligibles." Another segment of people are known as qualified Medicare beneficiaries ("QMBs"). QMBs consist of two subsets: 1) those people who are eligible for both Medicare and Medicaid benefits (i.e., dual eligible); and 2) people who are eligible for Medicare and are not eligible for Medicaid benefits, but meet a certain criteria of poverty. More specifically, QMBs are defined as individuals who are eligible for Medicare Part A benefits, have incomes not exceeding the federal poverty line, and have resources that do not exceed twice the amount set as the maximum for receiving benefits under the Supplemental Security Income program, 42 U.S.C. § 1382b, 42 U.S.C. § 1396d(p)(1).

By definition, QMBs are eligible for Medicare Part A enrollment and Part B insurance; however, because they are indigent, they will be unable to afford to buy the Part B supplementary coverage or pay the Part A or Part B deductibles or coinsurance costs. In an attempt to solve this dilemma, the Medicare and Medicaid Acts created a "buy-in" program. States participating in the

Medicaid program use Medicaid funds to pay the premiums to enroll a QMB in the Medicare Part B insurance program. Similarly, the state pays the deductibles and coinsurance payments that the QMB incurs under Part A or Part B with Medicaid funds. In essence, states use their Medicaid funds to buy their QMBs into the federal program, thereby shifting the primary payment for costs from the state's Medicaid plan to the federal Medicare program.

### DISCUSSION

Plaintiff furnishes enteral-feeding supplies to Medicare and Medicaid eligible patients including QMBs in Illinois. Wright, as the Director of IDPA, administers the Illinois Medical Assistance Program that was established pursuant to the Medicaid Act. The Secretary administers the Medicaid and Medicare Acts. In addition, the Secretary is also responsible for reviewing state plans for medical assistance and approving those plans that comply with the requirements of the Medicaid Act.

Plaintiff alleges that IDPA has a policy and practice of denying service providers their statutory right to full and direct reimbursement of the reasonable costs of supplies and services, as determined under the Medicare Act, rendered to QMBs in Illinois. More specifically, plaintiff alleges that pursuant to IDPA's policy and practice, approved by the Secretary, Medicare Part B providers are denied their right to full and direct payment, because the coinsurance payments they receive are at the lower rates at which IDPA reimburses Medicaid providers pursuant to the state's Medicaid program.

Plaintiff seeks an order declaring that Wright's administration of the Illinois medical assistance program, with the consent and approval of the Secretary, violates the Medicare and Medicaid Acts. Plaintiff also asks this court to enjoin any further violation of the Medicare and Medicaid Acts. Defendants contend that plaintiff lacks standing to bring this action because defendants did not cause plaintiff a direct injury. In addition, defendants assert that plaintiff lacks standing because plaintiff cannot establish an enforceable right.

As a Medicare Part B provider, plaintiff is entitled to receive 100% of the lesser of the provider's customary charge or the reasonable costs and charges as determined by the Secretary. 42 U.S.C. §§ 1395*l*, 1395cc(a)(2)(A); *Perales,* 954 F.2d at 858. IDPA pays providers of enteral-feeding supplies to QMBs *not* residing in nursing facilities the full Medicare Part B rate. If the QMB resides in a nursing facility, however, IDPA does not reimburse these providers directly. Instead, reimbursement for such supplies is made via the per diem rate paid to nursing facilities by the IDPA for residents' care.

The state Medicaid plan classifies plaintiff's feeding supplies as durable medical equipment ("DME"). 89 Ill.Adm.Code Ch. I, § 140.476(a). Under the Illinois Medicaid Plan, nursing facilities are reimbursed the costs incurred in providing feeding equipment to Medicaid recipients according to the IDPA's nursing facility rate. Feeding equipment, under the state Medicaid plan, is classified as a supply cost for reimbursement purposes. Supply costs are bundled together with other costs and paid on a per diem basis subject to IDPA's nursing facility rate. The IDPA Provider Handbook mandates that payments for DME be made directly to the nursing facilities, which, in turn, pay providers such as plaintiff.

Defendants argue that under plaintiff's provider agreement with IDPA, plaintiff must seek payment from the nursing facilities. Accordingly, defendants assert that plaintiff lacks standing to bring this suit because any injury suffered by plaintiff is not traceable to defendant because the nursing facilities are responsible for paying suppliers.

■ Under Article III of the United States Constitution, the federal courts adjudicate only "cases" and "controversies." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982). The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). To es-

tablish standing, a plaintiff must allege a personal injury that is traceable to the defendants' allegedly unlawful conduct, which is likely to be redressed by the requested relief. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). If the plaintiff is unable to establish standing, the court must dismiss the case for lack of subject matter jurisdiction. *Hope Inc. v. County of DuPage, Illinois,* 738 F.2d 797, 804 (7th Cir.1984).

Plaintiff asserts that because it renders Part B services to QMBs in Illinois it has a right to full and direct payment of Medicare Part B coinsurance for items and services rendered to QMBs pursuant to 42 U.S.C. §§ 1396a(a)(10)(E), 1396a(p), regardless of whether the QMB resides in a nursing facility. Plaintiff alleges that under the Illinois *medical assistance program,* the state reimburses plaintiff less than its reasonable costs as determined under the Medicare Act because defendant bundles the reimbursement for medical supplies provided to nursing home patients into the lower per diem rate that IDPA pays to nursing homes.

Defendants argue that because plaintiff is not a skilled nursing facility, IDPA's per diem reimbursement rates do not adversely effect plaintiff. Defendants further argue that plaintiff cannot show an improper Medicaid rate limitation that directly injures plaintiff because when plaintiff provides supplies to a skilled nursing facility, the nursing facility is then considered the "provider" under Medicaid, which is reimbursed for QMB cost-sharing. The court disagrees.

Plaintiff alleges an injury that results from the implementation and administration of the Illinois medical assistance program in an amount in excess of $3,000,000. Plaintiff's request to enjoin any further unlawful conduct will redress this alleged wrong. Accordingly, the only aspect of standing that warrants the court's consideration is whether the alleged injury is traceable to defendants.

In *Rehabilitation Association of Virginia, Inc. v. Kozlowski,* 42 F.3d 1444 (4th Cir. 1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 60, 133 L.Ed.2d 23, the Fourth Circuit addressed a similar standing issue. Under the Virginia plan rehabilitation agencies were

prohibited from billing the state Medicaid administrator directly for Medicare Part B deductibles and coinsurance on behalf of QMBs. Instead, rehabilitation agencies were to seek reimbursement from the nursing facilities where the beneficiaries resided. Like IDEA in the instant case, the state bundled these costs into a per diem rate that it paid to the nursing facilities. The court held that such a practice was inconsistent with the state agency's obligation to provide direct payment to the service provider. *Kozlowski,* 42 F.3d at 1460–61.

As in the instant case, the Secretary in *Kozlowski* argued that the rehabilitation association lacked standing because the nursing facilities, and not the members of the Rehabilitation Association, were the service providers. Addressing this argument the court stated (42 F.3d at 1460–61):

> [W]e note first the logical fallacy in the Secretary's analysis; just because one is required to see that service is provided does not make one the provider of service. While the long term care facility is required to provide certain service under the Medicaid Act, it is not, in fact, the actual provider of the services in question.... While the nursing facility may be required to provide the service under the Medicaid Act, in this instance it contracts with these third parties who "provide" the service.

■ As in *Kozlowski,* this court finds that, the allegations of the complaint establish that plaintiff, not the nursing facilities, is the actual provider of the feeding supplies and services. Thus, plaintiff's allegation that defendants' implementation and administration of the Illinois medical assistance program in a manner that denies providers of Part B services to QMBs the full amount of their reasonable costs for such services as determined under the Medicare Act is sufficient to establish an injury traceable to the conduct of the defendants. Accordingly, the court finds that plaintiff's complaint satisfies the standing requirements under *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984).

■ Defendants also contend that the provisions of the Social Security Act at issue

do not create enforceable rights that plaintiff can assert pursuant to 42 U.S.C. § 1983. To determine whether a federal statute creates enforceable rights, the court must focus on whether the statute in question was intended to benefit the plaintiff. *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). If so, the statute creates an enforceable right unless: 1) it reflects a mere "congressional preference" for a particular type of conduct, as opposed to a binding obligation on a government unit; or 2) the interest that plaintiff asserts is "too vague and amorphous" such that it is beyond the competence of the judiciary to enforce. *Id.*

In *Kozlowski* the court also addressed this issue. The court noted the Supreme Court's decision in *Wilder,* which held that the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), created enforceable rights for service providers. The *Kozlowski* court held that the analysis in *Wilder* applies to the related QMB provisions at issue in *Kozlowski,* the same provisions at issue in the instant case. 42 F.3d at 1449–50. As discussed below, this court agrees that where the state refuses to pay what a provider insists is the proper amount of coinsurance for QMBs, the providers have standing to challenge the state's interpretation of the statute.

First, the provisions of Medicare Part B reimbursement were dependent upon ensuring providers that they would receive 100% of the reasonable costs or charges for their supplies or services. 42 U.S.C. §§ 1395*l*, 1395cc(a)(2)(A). In *Perales,* the Second Circuit stated, "[s]ince the reasonable cost of the services would be covered, hospitals would not be deterred, because of non paying or underpaying patients in this aged group, from trying to provide the best of modern care." 954 F.2d at 859 (quoting S.Rep. No. 404, 89th Cong., 1st Sess. 27 (1965), reprinted in 1965 U.S.C.C.A.N. at 1943, 1965).

The court further reasoned that if health care providers were unable to collect their reasonable costs or charges they would refrain from treating the most needy class of individuals, the elderly, disabled and poor. *Id.* Clearly, such a result would be funda-mentally inconsistent with Congress' purpose in enacting the Medicare Act. *Id.*

Second, pursuant to Congress' removal of the language "at the option of the State" from the beginning of 42 U.S.C. § 1396a(a)(10)(E) via the Medicare Catastrophic Coverage Act of 1988, Public Law No. 100–360, § 301(a)(1), the obligation of states to pay Medicare cost sharing for QMBs is mandatory.

Finally, the court finds the judiciary is sufficiently competent to enforce a provider's right to Part B coinsurance payments for service rendered to QMBs. The coinsurance amounts are easy to compute. Medicare Part B cost sharing is defined in 42 U.S.C. § 1396a(p)(3). This definition includes the coinsurance amount—the 20% of the reasonable cost of an item or service (as determined by the Secretary) that is not paid by the federal government. Accordingly, following *Wilder,* the court finds that the statutes in question create enforceable rights under which plaintiff has standing to bring the instant case.

While the *Wilder* analysis compels this finding and confers standing to plaintiff, common sense reveals that plaintiff is the only logical party to contest the payment methodology at issue. The IDPA is content with reimbursing the nursing facilities on a per diem basis and allowing the nursing facilities to pay the providers such as plaintiff. The nursing facilities are not concerned with the amounts plaintiff receives as reimbursement because they are simply conduits that reimburse plaintiff according to the per diem rate established by the IDPA. Likewise, as QMBs the patients are not concerned about coinsurance payments—unless of course, the providers cease to provide their services because it is no longer economically feasible due to insufficient reimbursement rates. Clearly, such a scenario is undesirable. Accordingly, if plaintiff did not have standing to contest the current payment methodology it is unlikely that any party would ever seek to contest this practice.

## CONCLUSION

For the reasons stated above, the court finds that plaintiff has standing to bring the

instant suit, and therefore denies defendants' motions to dismiss.